Filed 10/1/14  P. v. Valencia CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B249006 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA363995) |
| v. | |
| JOSE MARIA VALENCIA et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  David B. Gelfound, Judge.  Affirmed and remanded with instructions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Jose Maria Valencia.

Corona & Peabody and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Jose Manuel Moreno.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Jose Maria Valencia and Jose Manuel Moreno (defendants)[1] appeal from judgments entered after they were convicted of conspiracy to commit murder. Valencia contends that the trial court erred in denying Moreno's *Wheeler-Batson* motion;[2] Moreno contends that the court erroneously admitted improper expert testimony; both defendants contend that the trial court erred in refusing to remove a juror for misconduct or in the alternative to declare a mistrial; Moreno requests that we review the sealed record of the trial court's in camera *Pitchess* hearing;[3] Valencia contends that the imposition of a $280 restitution fine violated the ex post facto clauses of the federal and state constitutions; and each defendant joins in any contention of the other defendant to the extent that it might accrue to his benefit. Respondent notes that although the trial court ordered Valencia to pay a restitution fine, it did not orally impose an amount, and respondent asks for a limited remand for that purpose. We conclude that defendants' contentions are without merit and that none accrues to the benefit of the other. We remand the matter for the sole purpose of allowing the trial court to determine the amount of the restitution fine. In all other respects, we affirm the judgment.

## BACKGROUND

**Procedural history**

The third amended information charged defendants and codefendant David Robles (Robles) with two counts of conspiracy to commit a crime, in violation of Penal Code section 182, subdivision (a):[4] murder in count 1 and kidnapping in count 2. It was also alleged that Moreno had three prior convictions within the meaning of the "Three

---

[1] When referring to defendants individually we use just their last names, Valencia and Moreno.

[2] See *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).

[3] See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); Penal Code sections 832.7 and 832.8; Evidence Code sections 1043 through 1045.

[4] All further statutory references are to the Penal Code, unless otherwise indicated.

Strikes" law (§§ 1170.12, subd. (a)-(d), 667, subd. (b)-(i)); one prior serious felony conviction within the meaning of section 667, subdivision (a)(1); and one prior conviction with a prison term within the meaning of section 667.5, subdivision (b).

Count 2 was later dismissed. The defendants were tried jointly, and the jury found Valencia and Moreno guilty as charged in count 1. The jury was deadlocked as to Robles and the trial court declared a mistrial as to him.

On May 24, 2013, the trial court sentenced Valencia to a term of 25 years to life in prison, ordered him to pay mandatory fines and fees and to provide print impressions and a DNA sample. The court awarded 1,558 days of presentence custody credit, comprised of 1,355 actual days in custody and 203 days of conduct credit.

The trial court found true the prior conviction allegations against Moreno following a court trial. The court denied Moreno's motion to strike the priors alleged pursuant to the Three Strikes law, but granted the People's motion to strike the prior conviction allegations under sections 667, subdivision (a)(1), and 667.5, subdivision (b). On May 31, 2013, Moreno was sentenced to 25 years to life in prison, tripled pursuant to the Three Strikes law to 75 years to life. The trial court ordered him to pay mandatory fines and fees and to provide print impressions and a DNA sample, and awarded him 1,567 days of presentence custody credit, comprised of 1,363 actual days of custody and 204 days of conduct credit.

Defendants filed timely notices of appeal from the judgments.

**Prosecution evidence**

*Conversations relating to the plan*

In 2009, a joint task force of the Los Angeles County Sheriff's Department (LASD) and the federal Drug Enforcement Agency (DEA) conducted wiretapping and surveillance operations targeting suspected major drug traffickers. The task force intercepted and recorded hundreds of cell phone conversations between various people, including defendants, Robles, and a person identified as "Secuestro" by law enforcement

3

and as "La Loca" or "Loquita" by others.[5]  The calls were translated from Spanish, and excerpts from more than 50 of them were admitted into evidence.  In addition, surveillance cameras were set up near some residences.  Photographs and video taken in July and August 2009 showed many meetings involving Robles, Valencia, and Secuestro at Robles's house.  Robles kept a semi-tractor rig at his home, and investigators suspected that he hauled narcotics for Valencia to Secuestro in Kansas City.

LASD Detective John Mundell was part of the task force.  He testified that drug traffickers often developed their own coded language in addition to a more generally understood jargon.  In his 25 years of law enforcement experience, including five years on the task force, Detective Mundell had learned to understand much of the jargon and code.  He gave some examples, such as "girl" as sometimes meaning methamphetamine, and the expression, "My girl is pretty and she's 12 years old," meaning a good quality pound of methamphetamine priced at $12,000.  In the course of this investigation, Detective Mundell discerned the possible meanings of words and expressions used in the recorded conversations, for example:  "title for the car" for payment; "toys" and "tools" for firearms; "buttons" for bullets; "four-five" for .45-caliber; "nine" for nine-millimeter; "exhaust" for silencer; "work" for dealing drugs; and "accident" for the loss of drugs, either by theft or interdiction by law enforcement.  Detective Mundell also determined the various nicknames and relationships of defendants and other participants in the conversations.  Robles was called "Potrecito" and "El Aguacate."  Valencia was variously called "Primo," "Guero," or "Chema," and used the alias, Raul Alvarez.  Moreno was called "Malo."

Detective Mundell testified that in late August 2009, he began to suspect a plan to murder someone named "Macho," who was also called "Machillo," and "Ocho" in the monitored telephone conversations.  Detective Mundell read to the jury the conversations

---

[5]     In their briefs, the parties alternate between the names, choose one, or use both names.  Law enforcement referred to him as Secuestro, but parties to the conversations and other witnesses called him La Loca.  For convenience, we refer to him just as Secuestro.

he believed to be most probative of his suspicion, and he explained his interpretation of them.

On August 31, 2009, Valencia spoke to "UM 162" (unknown male No. 162) in Kansas City. Valencia asked whether "that guy" was around. He then asked UM 162 to find him "because we already have one or two silencers available around there," and to "notify us with his location in order for them to go directly for him and avoid any failures like the last time they went over there." UM 162 agreed, and in another call the same day, the same voices spoke about a $900 money transfer. Later, Valencia spoke to another unknown male (UM 195) about the efforts to find "him," whom Detective Mundell took to mean Macho.

On September 2, Valencia spoke to Moreno in the early afternoon and arranged to meet him about a "compressor." In another call a few minutes later, Secuestro spoke to Moreno and asked whether he was willing to "go and take care of some things that we need to take care of over there." When Moreno asked where, Secuestro said, "Where those gossipers told you. Don't mention names." Asked which gossiper, Secuestro said, "The big one. The one El Cha." Moreno replied, "Oh, all the way over there?" Secuestro said he would "go there first to prepare the whole land," that it would take Moreno just three hours to get there, and that they would "buy round trip" so that Moreno could go on Saturday and come back the same day. The men arranged to meet the next day so that Secuestro could give Moreno details, documents, and title for the car.

Valencia then spoke to Secuestro and another man, Miguel Chavez, also known as "Babas," regarding the whereabouts of Ocho. Chavez said that Ocho had moved and changed cars, but could still be found at the billiard place on Central. They spoke of debts for a half onion and some work, and Ocho's threat against Chavez. During the conversation, Valencia said such things as, "I'm not going to kill him but I'm going to fuck him up so bad, so bad," and, "All I want to know is where he is because we're ready to go and get him," and "I'm well prepared, cousin. I have a fucking bitchen exhaust, one of those that don't make a noise to play races." Valencia then said that Secuestro was heading there: "I want for him to go so that -- since we don't know where to locate

5

him we're going to shoot him at the menudo place." Valencia added that since he went for menudo on Saturday, "that's what we have planned. But to avoid having this guy leave any trace in a hotel, it's better for him to go to your house instead."

After Secuestro entered the conversation, he and Chavez discussed debts, an offer of repayment by giving Ocho work, and Ocho's threat against Chavez. Secuestro then asked whether Chavez had buttons there for a four-five. Chavez replied, "If you pick him up alive then give it to me so I can confront that mother fucker." Secuestro again inquired about buttons for a four-five, and Chavez replied, "No, no, I got a toy over there, a nine." Secuestro said he would arrive with only Potrecito, not to say anything to "Jim," and to buy a new cell phone for Jim.

About an hour later, Valencia and Secuestro spoke to Moreno. Secuestro told Moreno that he would "hit the road" and "head out to where I told you [and] prepare the way for you to arrive." Moreno was insistent that he leave and return in one day, because he "just got out barely a week ago" and had not been with his family that long. Moreno also said that "if it is going to be done in one day and you give me your word that in one day, then I'll go, and you must have the guy there and I will do it." He also asked, "Are you going to have it all there," and "all ready right there?" Valencia said "Yeah," and he and Secuestro both assured Moreno it would be round trip, that he would soon be back with his family. Moreno replied, "Okay. Because this is a violation taking off, you know."

Detective Mundell explained that Moreno had been released from prison on August 22, 2009. As Detective Mundell interpreted the conversation, Moreno agreed to "do it" in one day, if Valencia had everything ready to go, including the intended target. Valencia assured him that the advance team would go there and make the necessary preparations. Asked for his opinion of the meaning of "doing it," based upon his investigation, training, and experience with regard to coded language, Detective Mundell replied, "He's gonna kill him."

In the next call a few minutes later, Valencia told Moreno that it was "going to be done early in the morning when he goes to eat around there." Valencia explained that

6

there were no flights that would arrive early enough so Moreno might need to leave the day or night before. Soon after that call, Valencia and Secuestro discussed departure options and getting a ticket for Saturday with a return the same day. At 3:16 p.m. Valencia spoke to a Manual [*sic*], also known as "Meno," saying that he was sending someone over there; that someone told him where "he" ate; and said, "We're going to go there to see if we can also order a menudito as well."

At 3:25 p.m., Secuestro informed Valencia that there was no way to get "there" Saturday morning, but told him about several Friday night arrivals with Saturday departures. Valencia then informed Moreno. They also discussed Moreno getting a passport-type photograph taken so Valencia could have an identification made for him with "the name you would like, something that you would not forget." When Moreno wondered whether this would be a "worthless dash," Valencia replied, "That is the reason why I wanted this one to go first. This one would go first and in a day you would find out where he lives. In the case that it does not go where he is supposed to go you would go to where he lives." After some unintelligible sound in the background, Valencia said, "Look, this cannot be talk [*sic*] over the phone." Moreno said, "Tomorrow I will go to meet with you. . . . Bye, Chema."

At about 4:00 p.m. on September 2, Valencia spoke to another unknown male (UM 479). Valencia asked where "Fernando" was, and UM 479 replied that "they were over there . . . in Kansas City, but they had moved from one place to another." Over the course of the conversation, Valencia said: "The one over there is the other guy that they are going to go visit on Saturday"; "I want to go visit Machillo on Saturday . . . and it seems they have located him over there. And so I'll see if I can invite him to eat some menudo on Saturday"; "I gave him a fistful, the son of a bitch. And I only got one haul through. With the next one he screwed me. . . . I had 18 wheelers that I work with. They took one of those from me and just got another one to keep going. And since I know where the guy is . . . I'm gonna go over there tonight . . . . I think that on Saturday he's gonna meet with some friends and maybe I'll show up there"; "we'll see who comes out on top. And I don't think that I'm the only one that is after them." UM 479 told

7

Valencia, "Keep at it" and "Hopefully you find the guy so you can make menudo out of him." Valencia replied, "Hopefully God willing. And Momo, if I bump into him I'm gonna remind him of the deceased, of Piolin . . . . I'll try to remind him of that friend so that he cleans up his act."

The next day, Valencia was heard in a call telling Moreno about taking the Jeep Cherokee to the shop because it had broken down. On September 6, Valencia told Moreno to come in the morning with his identification, and that he would get Moreno the ticket. Moreno replied that his brother would "take me to the bird so I can leave." Valencia responded, "That's fine. Don't talk so much." The next morning, Moreno left a message on Valencia's telephone: "Well, I'm here and now I'm leaving because there is no one here."

### Kansas City

Juan Manzo Chamale (Chamale) testified that Robles hired him just before the Labor Day weekend in 2009 to drive Secuestro in a white Jeep Cherokee to Kansas City. Chamale had a commercial truck driver's license, for tractor-trailer rigs. Chamale had made the same trip with Secuestro the preceding month. Chamale, joined by his friend Henry Ortega picked up Robles at his house on September 3, and drove to San Bernardino where they met Secuestro and Valencia. Because the white Cherokee was there but was not working properly, their trip to Kansas City was postponed until the next day. The next day, Chamale saw Moreno at Robles's house. Chamale, Ortega, and Robles again met Secuestro in San Bernardino, where Secuestro told Chamale that the Cherokee had been repaired and instructed him to drive it to Kansas City. Secuestro added that they would follow in a few hours. Secuestro and Robles drove in a blue GMC Envoy. Chamale communicated with them on the road through his cell phone's walkie-talkie. They met for food and rest in Denver. Once he and Ortega arrived in Kansas City, Chamale rented a room at the American Inn Hotel. Secuestro and Robles arrived about six hours later.

In the meantime, On September 4, 2009, Detective Mundell contacted Kansas City Police Officer Eric Jones, a member of the DEA joint task force in Kansas City, Kansas, and asked for assistance in the investigation. Detective Mundell furnished Officer Jones

8

with the license number of the Cherokee and GPS tracking information for Chamale's and Secuestro's monitored cell phones. Officer Jones found their cell phone signals in Denver and was able to track them into Kansas City. By the time the Cherokee arrived in Kansas City on September 6 at about 7:00 a.m., officers had established surveillance of the highway and the American Inn. At approximately 4:00 p.m. that afternoon, Officer Jones spotted the blue Envoy being driven in a manner suggesting a counter-surveillance purpose. He followed it to the American Inn Hotel.

The Envoy had been delayed by an unrelated traffic stop just before 10:00 a.m., conducted by Kansas Highway Patrol Trooper James McCord who saw the Envoy following another car too closely. Trooper McCord stopped the Envoy and spoke to the occupants, who appeared to be very nervous. Robles was the driver, and the passenger presented a Mexican driver's license in the name of Abel Ayala Hernandez. Trooper McCord became suspicious and searched the car at a police garage. The spare tire was not removed or searched. Since nothing out of the ordinary was discovered, the Envoy was released and Robles and Secuestro continued their journey.

Robles told Chamale about the traffic stop and said there would be a change in plans; now Chamale was to drive back to Los Angeles in the Cherokee without its spare tire. On the way to meet Robles to give him the spare tire, Chamale made an illegal U-turn, and was stopped by police. The Cherokee was taken to the police station and searched, but officers did not open the spare tire and found no contraband. At the American Inn Hotel the next day, Officer Jones spoke to Chamale and searched his room. Chamale then contacted Valencia and told him about the police searches. Valencia instructed him to get a new telephone and to abandon the Cherokee. Before leaving the Cherokee, Chamale stopped along the highway in an unsuccessful attempt to open the spare tire to see if anything was inside. Finding nothing, Chamale threw the tire away. Chamale and Ortega then left the Cherokee in an airport parking lot and took a flight back to Los Angeles.

Upon his return to Los Angeles, Chamale spoke to Detective Mundell and then flew back to Kansas City a few days later, where he was met at the airport by Officer

9

Jones. Chamale directed Officer Jones to the place he had disposed of the spare tire. After the tire was located they took it to a tire shop. Both Chamale and Officer Jones testified that they observed a gun wrapped in a yellow towel be removed from the tire. Officer Jones testified that it was a .45-caliber Glock handgun, with an empty magazine and silver duct tape on the muzzle. The aftermarket barrel was threaded to accommodate a silencer or suppressor.

In the meantime, on September 8, 2009, a search warrant was executed on a house in San Bernardino where officers searched the bedroom containing papers belonging to Raul Alvarez, the alias used by Valencia. There they recovered an object which Officer Jones later identified as a muzzle flash suppressor. During his testimony, Officer Jones demonstrated how the flash suppressor fit on the gun found in the spare tire.

**Defense evidence**

Robles and Moreno each presented evidence; Valencia did not. DNA analyst Matthew Farr testified that defendants were not identified as contributors to the DNA recovered from the Glock pistol or the duct tape found on the muzzle.

Chamale's friend Ortega testified that he thought they were going to Kansas City to sell a car, and did not know how they were going to return. He denied being part of an advance team to hunt, capture and kill Macho.

Robles admitted that he had known Secuestro for about three years and that he had driven trucks for Valencia, but denied transporting drugs in the trucks. Robles denied going to Kansas City to kidnap or kill Macho and denied hearing anyone talking about a mission to kill Macho. Robles went on the trip in order to fix a semi-truck tractor in Kansas City by removing the gas tank so that money could be hidden. Robles admitted that he knew the plan was drug related, but denied any plan to kill Macho. He thought the police were following them because of drugs.

**DISCUSSION**

**I. *Wheeler-Batson* motion**

Valencia contends that the trial court erred in denying Moreno's *Wheeler-Batson* motion, made on the ground that the prosecutor used peremptory challenges to

10

systematically exclude Hispanics from the jury.  The trial court found that Moreno had not made a prima facie showing of discrimination after the prosecutors exercised three of their first four peremptory challenges to excuse prospective jurors who appeared to be Hispanic.

The use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias violates both the state and federal Constitutions.  (*Wheeler*, *supra*, 22 Cal.3d at pp. 276-277; *Batson*, *supra*, 476 U.S. at p. 89.)  In reviewing a *Wheeler-Batson* motion, the trial court ordinarily engages in a three-step inquiry:  the first step requires the objecting party to make a prima facie showing of prohibited group bias; in the second step, reached only if the objecting party has successfully made a prima facie showing, the burden shifts to the party who exercised the peremptory challenge to give a nondiscriminatory reason; and in the third step, the court determines whether the objecting party has proven purposeful discrimination.  (*People v. Silva* (2001) 25 Cal.4th 345, 384; *Purkett v. Elem* (1995) 514 U.S. 765, 767.)  "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike.  [Citation.]  The three-step procedure also applies to state constitutional claims.  [Citations.]"  (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613.)

Respondent contends that Valencia forfeited this contention by failing to join in Moreno's motion below.  Valencia counters that if the issue has been forfeited, we should nevertheless reach the merits to avoid a claim of ineffective assistance of counsel in violation of the Sixth Amendment.  "'Generally, failure to join in the objection or motion of a codefendant constitutes a waiver of the issue on appeal.'  [Citations.]  [¶]  A litigant need not object, however, if doing so would be futile.  [Citation.]"  (*People v. Wilson* (2008) 44 Cal.4th 758, 793.)   As we explain, we agree with the trial court that Moreno made no prima facie showing of intentional discrimination.  Thus, Valencia's joinder would have been futile, and although there would then be no forfeiture, "[t]he Sixth Amendment does not require counsel to raise futile motions.  [Citations.]"  (*People v. Solomon* (2010) 49 Cal.4th 792, 843, fn. 24.)  Counsel's representation does not become

defective by failing to join a meritless objection.  (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

It is presumed that the prosecution uses its peremptory challenges in a constitutional manner.  (*Wheeler, supra*, 22 Cal.3d at pp. 278-281.)  To rebut that presumption and establish a prima facie case of discrimination, the moving party is required to produce sufficient evidence to show that "'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'  [Citation.]"  (*Johnson v. California* (2005) 545 U.S. 162, 168, 170 (*Johnson*); see also *People v. Thomas* (2012) 53 Cal.4th 771, 793-794.)

Valencia argues that the defense made a prima facie showing because 75 percent of the challenges made were of jurors who appeared to be Hispanic.  This was 75 percent of four people early in jury selection, however, and four other apparently Hispanic prospective jurors remained in the jury box.  Further, Valencia does not refer to the record to show how many other Hispanic jurors there were in the venire, or how many were questioned, challenged, or ultimately seated.  A numerical showing alone generally falls short of a prima facie showing unless the number is large enough to suggest a pattern of impermissible exclusion.  (*People v. Harris* (2013) 57 Cal.4th 804, 835 (*Harris*).)  A defendant could conceivably be able to make a prima facie showing with a percentage of a large number of jurors; but a very small "sample makes drawing an inference of discrimination from this fact alone impossible.  '[E]ven the exclusion of a single prospective juror may be the product of an improper group bias.  As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.'  [Citation.]"  (*People v. Bell* (2007) 40 Cal.4th 582, 598, fn. omitted; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 342-343 (*Bonilla*).)

Valencia's numerical argument is particularly inadequate here, where the prosecutor gave facially race-neutral reasons for the excusals.  (See *Harris, supra*, 57 Cal.4th at p. 835.)  After the trial court ruled that no prima facie case had been established, the prosecutor nevertheless asked to make a record.  He explained that one juror was excused because he disagreed with the concept of equal liability for

12

accomplices. Another prospective juror stated that he had been mistakenly arrested in 1983 and treated very badly by the police. The third presumptive Hispanic juror had worn a black T-shirt to court, had a large tattoo of what appeared to be a dragon or a demon, and he was due in court himself on a custody matter.

Although Valencia does not dispute that the prosecutor's reasons were facially race-neutral, he contends that the trial court made an inadequate evaluation of the explanations. He argues that when subjected to a comparative analysis, the prosecutor's reasons appear to have been pretextual, not genuinely race-neutral. This contention is more appropriate in step three of a *Wheeler-Batson* analysis, as the existence of a prima facie showing does not hinge upon the prosecutor's sincerity. (*Bonilla, supra*, 41 Cal.4th at p. 350.) Thus the trial court was not required to evaluate the sincerity of the prosecutor's reasons, and did not err by simply agreeing to hear them after the court had already ruled. (See *People v. Taylor* (2010) 48 Cal.4th 574, 616-617.) Since the defense did not make a prima facie showing of purposeful discrimination, a comparative analysis was not relevant in the trial court; further, as we agree with the trial court that no prima facie showing was made, it is equally irrelevant here. (See *People v. Howard* (2008) 42 Cal.4th 1000, 1019-1020.) We conclude that the trial court did not err in denying the motion.

## II. Expert testimony

Moreno contends that Detective Mundell's testimony that Moreno intended to kill Macho was an improper expert opinion which lessened the prosecution's burden of proof, resulting in a denial of due process and a fair trial.

The challenged opinion followed the reading of the transcript where Moreno said that "if it is going to be done in one day and you give me your word that in one day, then I'll go, and you must have the guy there and I will do it." Asked for his opinion of the

meaning of "doing it," based upon his investigation, training, and experience with regard to coded language, Detective Mundell replied, "He's gonna kill him."[6]

Respondent contends that Moreno failed to preserve the issue for review, as Moreno's counsel objected without stating a ground. We agree. A judgment may not be reversed by reason of the erroneous admission of evidence unless a timely objection was made and the specific ground of the objection was made clear to the court. (Evid. Code, § 353.) Despite having failed to state any ground for his objection, Moreno now challenges the evidence not only as improper expert opinion, but also as a constitutional violation. His failure to state a ground for objection forfeits his constitutional contention, as well. (See *People v. Partida* (2005) 37 Cal.4th 428, 433-434 (*Partida*).)[7]

Moreno claims that the court's ruling gave him no opportunity to state his ground. He relies on *People v. Kitt* (1978) 83 Cal.App.3d 834, overruled on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836, in which the appellate court found that the particular facts in the record of that case made it "abundantly clear" that an adequate objection to one photograph was understood as an objection to two similar photographs. The court did not hold that merely overruling a general objection forecloses all opportunity to add the specific ground of the objection.

Moreno also claims that the court and the prosecutor "had to have" understood the basis for the objection because the court did not ask for clarification and "quickly" overruled the objection. He relies on *People v. Diaz* (1992) 3 Cal.4th 495, 528 (*Diaz*), in which the California Supreme Court noted that "'*where the record shows . . .* that all the

---

[6]     "A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

[7]     Moreno has also failed to preserve his claim that counsel was ineffective by failing to timely state a ground for the objection, as it was made for the first time in his reply brief. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

parties, including the court, must have understood the purpose of the objection, it will not be said that the objection failed of its purpose.' [Citation.]" (*Ibid*., quoting *People v. Scott* (1978) 21 Cal.3d 284, 290, italics added.) In *Diaz*, the court found that the record was inadequate to show that either the prosecution or the trial court understood the intended ground of the objection. (*Diaz*, at p. 528.)

Here too Moreno's contention is unsupported by the record. We reject the characterization of the court's ruling as quick, as it cannot be determined from the transcript how quickly the trial court ruled. Further, the absence of a request for clarification is equally consistent with *mis*understanding as it is with understanding. "'Trial judges are not supposed to have the numerous, varied, and complex rules governing the admissibility of evidence so completely in mind and of such ready application that under an omnivagant objection to a question they can apply with legal accuracy some particular principle of law which the objection does not specifically present.' [Citations.]" (*Partida, supra*, 37 Cal.4th at p. 434.)

Moreover, if we held that the failure of the court to request clarification was sufficient to establish that it understood the ground for a general objection, we would effectively eliminate the requirement of stating any ground, thereby judicially rewriting Evidence Code section 353. The separation of powers doctrine precludes such a result. (See Cal. Const., art. III, § 3; *People v. Bunn* (2002) 27 Cal.4th 1, 16-17.)

In any event, we agree with respondent that any error was harmless. The erroneous admission of expert testimony warrants reversal of a judgment only if it is reasonably probable that a result more favorable to the appellant would have been reached absent the error. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); *People v. Pearson* (2013) 56 Cal.4th 393, 446; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) When the evidence is so strong that the jury could easily have come to the same conclusion as the expert, and the jury is properly instructed in evaluating expert testimony, any error in admitting the opinion is harmless. (*People v. Davis* (2009) 46 Cal.4th 539, 605.) Here, the trial court read CALCRIM No. 332 to the jury, instructing them regarding the evaluation of expert opinions. Among other things, the court

15

instructed the jury that it was not required to accept the opinions as true or correct, that it should follow the court's instructions regarding the believability of witnesses in general, and that it should consider whether facts on which the expert relied were true and accurate. The court concluded: "You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

That Moreno intended to kill Macho was more than adequately supported by the evidence. Also there is no merit to Moreno's suggestion that without Detective Mundell's opinion, the jury could have concluded that Moreno might have intended to go to Kansas City to kidnap, rob, or beat Macho, or commit some other crime. Indeed evidence that Valencia planned to have Macho killed and he hired Moreno to do the job was overwhelming. In a flurry of code-filled telephone calls over just a few days, Valencia told an acquaintance that he and Secuestro were "going to shoot him at the menudo place," that he had silencers available, and that he needed bullets for a .45-caliber weapon.

During that time, Secuestro asked Moreno whether he was willing to "go and take care of some things that we need to take care of over there." Secuestro would "go there first to prepare the whole land," that it was a three-hour trip for which he would get a round-trip ticket, and that Moreno could go on Saturday and come back the same day. When Moreno received instructions from Valencia on obtaining false identification, Moreno wondered whether the trip would be a "worthless dash." Valencia assured him, "This one would go first and in a day you would find out where he lives." Valencia then warned Moreno that this could not be discussed over the telephone. On September 6, Valencia told Moreno to come in the morning with his identification and that he would get Moreno the ticket. Moreno agreed; his brother would take him to "the bird" so he could leave. Valencia again warned him, "Don't talk so much." Meanwhile, Secuestro and others arrived in Kansas City with a .45-caliber handgun, an empty cartridge magazine, and an aftermarket gun barrel that would accommodate a silencer or suppressor. The involvement of law enforcement then forced a change in plans. Moreno arrived for his flight but no one met him.

16

We conclude that there is no reasonable probability that the result would have been different absent Detective Mundell's opinion, and that its admission was thus harmless under the standard of *Watson, supra*, 46 Cal.2d at page 836.

**III.  Juror misconduct**

Defendants contend that the trial court erred in refusing to remove Juror No. 9 for misconduct or in the alternative to declare a mistrial due to improper juror contact.

A criminal defendant has a constitutional right to a fair trial by an impartial jury. (See U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *Duncan v. Louisiana* (1968) 391 U.S. 145, 149; *In re Hamilton* (1999) 20 Cal.4th 273, 293-294 (*Hamilton*).) "An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it."' [Citations.]" (*Hamilton, supra*, at p. 294.)  "A sitting juror's involuntary exposure to events outside the trial evidence, even if not 'misconduct' in the pejorative sense, may require similar examination for probable prejudice."  "[A] nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice.  [Citations.]" (*Id*. at pp. 294-295.)

However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation . . . ; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (*Smith v. Phillips* (1982) 455 U.S. 209, 217; see also *In re Price* (2011) 51 Cal.4th 547, 560 (*Price*).)  "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.  [Citation.]" (*Hamilton, supra*, 20 Cal.4th at p. 296.)

Section 1089 permits the trial court to remove a juror at any time upon a showing of good cause, such as where the juror is shown to be unable to perform his or her functions due to bias.  (*People v. Beeler* (1995) 9 Cal.4th 953, 975 (*Beeler*).)  "'A juror's

17

inability to perform his or her functions . . . must appear in the record as a "demonstrable reality" and bias may not be presumed.' [Citations.]" (*Ibid.*) Whether a party has made a sufficient showing is one within the discretion of the trial court, "'and if there is any substantial evidence supporting that decision, it will be upheld on appeal.' [Citation.]" (*Ibid.*)

Moreno contends that the questioning of jurors established that Juror No. 9 initially lied to the court, withheld information, and was forthcoming with the truth only when the court questioned her a second time. Contrary to Moreno's characterizations, the trial court found that the difference in Juror No. 9's answers was the result of confusion, not misconduct. We must give great weight to the court's credibility determinations. (*Price, supra*, 51 Cal.4th at p. 563.) "We accept the trial court's factual findings and credibility determinations if supported by substantial evidence. [Citation.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 192 (*Tafoya*).) Here, substantial evidence supports the trial court's determinations and decision.

Sometime during the trial Detective Mundell reported that Juror No. 9 had spoken to him in line in the cafeteria. Detective Mundell told the court that he did not think she knew it was him when she first spoke, because she then turned, looked at him and said, "I'm not supposed to talk with you." When Juror No. 9 was questioned, she told the court that she was buying coffee in the cafeteria, saw money on the counter, and before she saw who she was talking to, said, "Oh my God, I almost grabbed your money." Juror No. 9 then said, "Oh I can't talk to you," and nothing more was said. She apologized to the court. The court found no misconduct, and Moreno's counsel stated that he was satisfied with Juror No. 9's response and no longer asked that she be dismissed.

Later, during deliberations, Juror No. 12 informed the bailiff that someone had spoken to him outside the courtroom and asked him to vote "not guilty." When Juror No. 12 was called into the court for questioning, he reported that while he sat on the bench waiting to enter the courtroom, an older Hispanic lady he had never seen before asked whether she could ask him a question. Thinking that she was lost, he approached her, and the woman said, "Can you please say not guilty." Juror No. 12 asked her about

18

which case she was referring to and the woman gave the name of an unrelated case. Juror No. 12 told her that he was not involved in that case. The women said, "Oh," and there was no further conversation. Juror No. 12 told Juror No. 6 and an alternate juror with a goatee what had happened. He told the court that his ability to be fair would not be affected by this event.

The court questioned each juror individually about what they heard. Juror No. 6 confirmed what Juror No. 12 said and added that she told Juror No. 9 about the incident. Juror No. 9 was asked whether a juror had informed her of contact made with another juror, and she replied, "No." When the court told her not to discuss what "we talked about," she replied, "No, sir. We didn't talk about much, but I won't." Juror No. 6 was again questioned. She confirmed that she had mentioned the incident to Juror No. 9, and believed that more people knew about it.

Jurors No. 1, 3, 7, and Alternate Juror No. 1 all denied hearing anything about any third-party contact with another juror. Alternate Juror No. 3 reported that he was present when Juror No. 12 spoke with a woman in Spanish, which he did not understand, and that after the conversation, Juror No. 12 told him that the woman asked him "to say guilty, I guess, something along those lines." Juror No. 2 heard from Juror No. 6 that someone had "wanted the translation of not guilty and what that may have been. That's all I heard." Juror No. 4 heard from Juror No. 10 that someone had spoken to one of the jurors about a case in another court. Juror No. 5 had heard that someone had asked one of their Spanish-speaking jurors to vote not guilty. Juror No. 8 overheard jurors speaking about someone telling one of the jurors something. Juror No. 10 stated that Juror No. 12 told him and Juror No. 6 that a woman had asked him in Spanish whether he could vote not guilty. Juror No. 11 heard that "someone got approached by someone" but did not know further details. Alternate Juror No. 4 stated that a female juror told him that someone approached a male juror and asked him to "say not guilty" for an unrelated case. The trial court instructed the jurors not to discuss the incident, and those who had heard of the contact assured the court that each of them could remain fair and impartial and would follow the court's instructions.

After further discussion regarding Juror No. 9, she was again brought into the courtroom. Juror No. 9 reaffirmed that Juror No. 6 did not inform her of the incident where a juror had been contacted by a third party, but she stated that she did hear from someone else about such contact. She heard that "somebody spoke Spanish and said something about another trial." She heard nothing else in that regard, and told the court that this would not affect her ability to be fair and impartial in this case. The court instructed her not to discuss the matter with other jurors.

Following the lunch recess Moreno's counsel moved to excuse Juror No. 9 due to both her contact with Detective Mundell in the cafeteria and because her statement conflicted with Juror No. 6's statement. The trial court again questioned Juror No. 6 who stated that she was with Juror Nos. 10 and 12 when the contact happened, that she told Juror No. 9 about it after that, but "I don't know if she heard me so I don't know if she really understands what is going on, but I did talk to Juror No. 9." She explained, "It was really in passing, like someone talked to Juror No. 12 about a verdict or something like that. And I don't even know if she understood me, but I did speak with her about it." According to Juror No. 6, Juror No. 9 seemed confused and "just nodded."

Moreno's counsel again asked that the court to excuse Juror No. 9, because Juror No. 6 seemed credible, Juror No. 9 initially denied that juror No. 6 told her of the incident, and because of the contact in the cafeteria. The trial court found no misconduct and denied the request. The jurors' responses to the questioning provides ample support for the trial court's conclusion that Juror No. 9 had been confused and did not engage in misconduct. Thus there was no abuse of discretion in the court's refusal to dismiss her. (See *Beeler, supra*, 9 Cal.4th at p. 975; § 1089.)

Defendants contend that the trial court should have given an instruction drafted by Moreno's counsel. Counsel asked the court to instruct the jury with the fourth paragraph of CALCRIM No. 101, modified to read as follows: "You must not allow anything that happens outside of this courtroom to affect your decision. Anything that may have happened this morning has nothing to do with any of the defendants in this case." Valencia's counsel joined in the request to which the prosecutor objected. The court

20

denied the request finding that CALCRIM No. 222 sufficiently covered the substance of CALCRIM No. 101. The court then instructed the jury with CALCRIM No. 222, including the following sentence: "You must disregard anything you saw or heard when the court was not in session even if it was done or said by one of the parties or witnesses."

The trial court did not err. A court may properly refuse a confusing pinpoint instruction. (*People v. Gurule* (2002) 28 Cal.4th 557, 659.) The requested instruction would likely have confused the jurors who had heard nothing about the incident, whereas the language in CALCRIM No. 222 provided the same admonition in a neutral manner, without bringing attention to the particular incident.

In any event, the circumstances indicate no reasonable probability that one or more jurors were actually biased against defendants. The incident was brief, the unidentified speaker was not connected to anyone in this case, and none of the responses to the court's questions indicated any bias on the part of any of the jurors. Thus we conclude that it was neither inherently nor substantially likely to have influenced any juror. Further, the jurors indicated they could follow the instructions in this case; and those who had heard something about the incident assured the court they could remain fair and impartial. As there was no reasonable probability of bias or prejudice, defendants were not entitled to a mistrial. (See *Hamilton, supra*, 20 Cal.4th at p. 296.) Moreover, as we concluded in the previous section, the evidence of the conspiracy was overwhelming. With no probable bias and overwhelming evidence of guilt, reversal is not indicated. (*Tafoya, supra*, 42 Cal.4th at p. 192.)

## IV. *Pitchess* **review**

The trial court granted Moreno's pretrial *Pitchess* motion for the discovery of any information contained in Detective Mundell's personnel file pertaining to incidents of coercive conduct or false reporting. An in camera hearing was held to determine whether any such information existed. Once it was determined that there were no discoverable items in the records produced the matter was concluded. Moreno requests that we review the sealed record of the in camera hearing and the court's determination.

We review the trial court's proceeding for an abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.) The records produced in the trial court were not retained, but during the in camera hearing the trial judge examined and described each report and stated reasons for his determination. Upon review of the sealed transcript of the hearing we find it sufficient to review the trial court's determination, without having to order the production of the same documents in this court. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.) We further conclude the trial court properly exercised its discretion in determining that the documents produced complied with the scope of the order granting the *Pitchess* motion, and that none of the documents or information need be disclosed to the defense.

## V. Ex post facto

Valencia contends that the imposition of a $280 restitution fine was unauthorized and violated the ex post facto clauses of the state and federal constitutions. He contends that the record shows that the trial court intended to impose the minimum fine, which was $200 at the time of his offense. (See former § 1202.4, subd. (b)(1); Stats. 2008, ch. 468, § 1.)

Ex post facto laws are prohibited by both the California and United States Constitutions. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) "[T]he imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143.) An ex post facto law is a statute that punishes as a crime an act which was not a crime when committed, or that inflicts greater punishment than permitted by the law applicable when the crime was committed. (*Collins v. Youngblood* (1990) 497 U.S. 37, 42-43.) Similarly, an amendment that increases the punishment associated with a crime after its commission is prohibited. (*People v. Acosta* (2009) 176 Cal.App.4th 472, 475.) Thus, an amendment increasing a fine may be imposed only prospectively.

The amount of a restitution fine rests within the trial court's discretion so long as the amount is "commensurate with the seriousness of the offense," is at least the statutory

22

minimum, and does not exceed the maximum. (§ 1202.4, subd. (b)(1); *People v. Urbano* (2005) 128 Cal.App.4th 396, 405.) The minimum was $200 at the time of Valencia's crime, with a maximum of $10,000. Thus, the court was authorized under the prior law to impose a fine in some amount between $200 and $10,000. The primary purpose of the ex post facto clause is "to prevent unforeseeable punishment." (*People v. Snook* (1997) 16 Cal.4th 1210, 1221.) We thus agree with respondent that as the foreseeable range of punishment was between $200 and $10,000 at the time the crime was committed, any amount within that range, including $280, would not offend the ex post facto clause.

However, as respondent also points out, although the trial court ordered Valencia to pay a restitution fine, the court did not set the amount of the fine. The court stated, "He's to pay the following: a restitution fine, a parole revocation restitution fine, a criminal conviction assessment, a court operations assessment." Although the court did not specify any amount, the minutes state the amount as $280, and the clerk also inserted that amount into the abstract of judgment. Respondent requests a limited remand to permit the trial court to set the amount of the fine. Valencia suggests that because the clerk chose the statutory minimum in effect at the time of sentencing, the trial court must have intended to impose the minimum, and asks that we modify the judgment accordingly.

We must remand as respondent asks, as the amount of the fine is part of the judgment that must be orally pronounced by the court. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 386-387 (*Zackery*); § 1193, subd. (a); § 1445.) "The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment. [Citation.]" (*Zackery*, at pp. 387-388.) Thus, the $280 restitution fine reflected in the minutes and the abstract of judgment must be stricken.

Although the amount of the restitution fine is discretionary, its imposition in some amount between the minimum and maximum is mandatory "unless [the trial court] finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (§1202.4, subd. (b); see *People v. Tillman* (2000) 22 Cal.4th 300, 302.)

Because the trial court did not state any such reasons on the record here, but did in fact order Valencia to pay a restitution fine, we remand the matter to allow the court to determine the appropriate amount. (See *Zackery, supra*, 147 Cal.App.4th at p. 389.)

## DISPOSITION

The notation of $280 as the amount of the restitution fine imposed upon Valencia is stricken from the trial court's minutes of May 24, 2013, and from the abstract of judgment filed June 6, 2013. The matter is remanded for the sole purpose of permitting the trial court to determine the amount of the restitution fine Valencia is to pay, to orally pronounce that amount, and to provide the Department of Corrections and Rehabilitation an amended abstract of judgment. In all other respects the judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST

24